WEAVER, RESPONDENT, *v.* WEST COAST LIFE INSURANCE CO., APPELLANT.

(No. 7,342.)

(Submitted March 5, 1935. Decided March 20, 1935.)

[42 Pac. (2d) 729.]

*Messrs. Kremer & Kremer, Mr. H. D. Carmichael* and *Mr. L. P. Sanders,* for Appellant.

*Mr. M. S. Galasso* and *Mr. N. A. Rotering,* for Respondent.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff brought this action against the defendant, a corporation licensed to transact a life insurance business in Montana, to recover damages alleged to have been suffered by her by reason of the failure of the defendant to accept or reject the application of her husband for life insurance within a reasonable time.

In her complaint plaintiff alleged the corporate capacity of the defendant; that it was transacting a business of selling

and issuing policies of life insurance and was licensed to do business in the state of Montana; that plaintiff was the wife of James Weaver, who died January 21, 1931; and that one Goodman was the agent of the defendant to sell life insurance contracts. These allegations were admitted by the defendant.

It was further alleged in the complaint that on or about October 10, 1930, Goodman, as defendant's agent, sought out the plaintiff and her then husband and obtained from them applications to the defendant for a joint policy of life insurance insuring their lives against death in the sum of $3,000, payable to the survivor; that Goodman then informed plaintiff and her husband that the annual premium for this policy was the sum of $121.01; that the policy would be delivered to them about November 1, 1930, from which date the insurance would be in full force and effect; that they relied upon the statements made by the agent, and signed the applications with the understanding that they must submit to an examination by a physician selected by defendant; and that they settled the first annual premium by the execution and delivery of a promissory note due in ninety days, which was accepted by the agent. These allegations were denied by the defendant.

Plaintiff further alleged that on October 10, 1930, the agent of defendant took her and her husband to Dr. Kane, a medical examiner for the defendant, who examined them; this is admitted by defendant. It is then alleged that at the conclusion of the examination Dr. Kane informed them that they were both in good physical condition, and that he would so report to the defendant; that on several occasions between the first and the twentieth days of November Goodman informed plaintiff and her husband that "the policy is on its way and that you will get it any day"; that they should not worry; that the policy had been issued, and that everything would be all right; that they believed these statements, and by reason thereof did not apply to any other life insurance company for a similar policy, which they would have done had it not been for these statements by the agent; that about November 20, 1930, plaintiff and her husband tendered payment of

the note to the agent, which was made payable to himself; that he informed them he was busy with other matters and did not have the "note handy," not to worry, but that he would call upon them in a few days, take the money, and return the note; that defendant negligently failed to deliver to plaintiff and her husband the policy of insurance applied for, or any other policy of insurance, and failed to issue a joint policy of insurance within a reasonable time, or, as promised by the agent, during the lifetime of plaintiff's husband, and never, until after the death of her husband, advised her of the rejection of the application, but, on the contrary, defendant, acting through its agent, stated that the policy had been issued, or would be issued, and thereby defendant lulled plaintiff and her husband into a feeling of security, and prevented them from applying to another life insurance company for a policy, which they would have done had it not been for the conduct of defendant's agent. All these allegations were denied by the answer of defendant.

Plaintiff alleged that on December 10, 1930, her husband became ill and died on January 21, 1931; that she notified defendant of his death, and requested blanks for the purpose of making proof of loss and demanded payment of the sum of $3,000, which the defendant refused to pay. Defendant admits the death of plaintiff's husband, her demand and its refusal to pay.

The further allegation of plaintiff that defendant should have acted upon the applications within a reasonable time, but that it neglected to act thereon at any time between the date of the applications and the death of Weaver, is denied in defendant's answer.

Defendant moved to strike certain allegations from the complaint; the motion was granted in part and denied in part. Thereafter a general demurrer was filed, which was overruled. The answer, in addition to the admissions and denials already noted, pleaded an affirmative defense, to which plaintiff replied, denying all allegations inconsistent with her complaint. The cause was tried before the court sitting with a

jury. At the outset of the trial the defendant again challenged the sufficiency of the complaint for substance. Substantially all of the testimony offered in support of plaintiff's cause of action was received in evidence over defendant's objections on numerous grounds.

Plaintiff testified that on the evening of October 10, 1930, Goodman, admittedly an agent of the company authorized to solicit insurance contracts, appeared at her home and engaged plaintiff and her husband in conversation "about a joint policy" on both of them for $3,000, payable to the survivor after the death of either; that Goodman said they might expect the policy in two weeks or around the 1st of November; that, following the examination by Dr. Kane of plaintiff and her husband, he (Dr. Kane) said that "we were both in good health." The note given for the first premium, in the sum of $128.01, signed by Mr. Weaver, was received in evidence. Plaintiff testified further that about November 20, 1930, she offered to pay Goodman the amount of the note, and he said, "I am awfully busy, Mrs. Weaver, and I have not got the note handy, but you come back later or I will come up to your house and will bring the note with me"; that she and her husband relied on the statements made by Goodman and Dr. Kane, and received no notice prior to Weaver's death of the rejection of the applications, and that, if such notice had been received by them in October, November or December, they "would have went elsewhere for insurance to some other insurance company" for a joint policy in the sum of $3,000, and that her husband had secured other insurance on his life in 1926; that in response to a demand by letter, dated February 21, 1931, defendant advised plaintiff that the applications had never been accepted by the company; and that between October 10, 1930, and December 20, 1930, her husband had suffered no accident or serious illness.

Dr. Kane identified the medical examiner's report, which was received in evidence, and testified that from the answers in response to the questions on the report made to the defendant he considered Mr. Weaver's health "was all right,"

and "I considered him insurable"; that he made no laboratory test of the lungs of Mr. Weaver, and never saw him again.

The witness O'Connell, who was present at the time of the solicitation of the insurance applications from plaintiff and her husband, testified that the Weavers applied for a joint policy for $3,000; that he had formerly acted for the defendant company as a soliciting agent, and that, from his knowledge and experience, two weeks was a reasonable time after the medical examination was completed within which the defendant could accept or reject the application; and that he saw the application blank of Mr. Weaver at the time it was signed, and the amount of insurance specified was $3,000 "joint life" instead of "$2,000" of "Endowment 85." The application which the company received signed by Mr. Weaver was for $2,000 endowment at the age of 85. O'Connell testified that nothing was said at the time of the signing of the application about any other form of insurance, and that Goodman propounded the questions to the applicant and recorded the answers in a notebook to be thereafter transcribed on the application blank then signed by Mr. Weaver, and that, other than the amount and kind of insurance, the name and address of the applicant, and the history of his brothers and sisters, the application was entirely blank at the time of its execution by Weaver.

Carlos C. Warner, secretary of the defendant company, whose home office is at San Francisco, California, testified that the application signed by James Weaver was received at their office in San Francisco on October 29, 1930; that, as such officer, he on October 30, instructed Mr. Goodman to request Mr. Weaver to report to Dr. Kane for further examination.

Dr. Austin, who was the medical examiner for the defendant at its home office, said he wrote Dr. Kane on October 30, 1930, "for additional medical history, additional physical examination and report, and further report concerning the insurance history of the applicant, and whether or not he had ever been declined by any insurance company." He further said he had secured information relative to whether the appli-

cant had suffered from any ailment or disease of the lungs from the Metropolitan Life Insurance Company.

The application signed by the applicant, Weaver, contained the following question: "Has any accident, health or total or permanent disability application for insurance on your life been declined, postponed or withdrawn or any such insurance on your life been cancelled by any company, association or society?" to which the answer was, "No." In response to inquiries in the medical examination as to whether the applicant had ever consulted a physician for any ailment or disease of the lungs, the applicant answered, "No." He also said that he was in good health as far as he knew.

The witness Means, assistant medical director of the Metropolitan Life Insurance Company, testified that on April 2, 1929, his company received an application for life insurance from Weaver at San Francisco, that the application was rejected on his recommendation, and that he based his action upon the report of Dr. Smetters, of Butte, wherein it was stated "that his general appearance as to health was fair (pale), that the respiratory sounds over the right lung were roughened, and that his recommendation of the applicant was doubtful on account of his lungs. I therefore thought it advisable to make inquiry further of the doctor and ask him to review the lungs and appearance in three weeks from that date; also, if he was still anemic and if he suspected that he had tuberculosis. In answer to these questions the doctor stated that the applicant's cough continues, the breath sounds are roughened, is anemic, and that he suspected beginning of silicosis."

Dr. Smetters was called as a witness, and identified his medical report made for the Metropolitan Life Insurance Company, which was offered and received in evidence. The application was declined by that company on April 30, 1929.

Dr. Mondloch, of Butte, testified that on the ninth day of October, 1930, he saw Mr. Weaver in the clinic of the Butte Anti-Tuberculosis Society, located in the courthouse. He said: "I examined him on that day, and found Mr. Weaver to be

suffering from chronic tuberculosis, pulmonary. I advised him to go to Galen [State Tuberculosis Sanitarium], if possible, and advised him as to his condition. I told him that he had chronic pulmonary tuberculosis, and requested a specimen of his sputum." He further testified that on the day mentioned the applicant had a disease of the lungs. It appeared from the evidence that the sample of the sputum requested was furnished, but by whom it was brought to the clinic is in some doubt from the record. However, the sample was transmitted to Helena for examination by the bacteriologists in the employ of the state board of health, who reported on October 11 that the character of the sputum was mucopurulent, and that many bacilli tuberculosis were found therein, the cells containing polys and lymphs.

Dr. McCarthy testified that he attended James Weaver in his last illness and that he certified in the death certificate that the principal cause of his death was silicosis.

Goodman, the agent who solicited the application, testified that the answers were written into the application for insurance before it was signed by Weaver; that the amount of insurance on his application was originally for the sum of $1,000; that he erased it before it was signed and wrote in the figures $2,000," and the following, "end. age 85"; that he received a letter about November 3 from Dr. Austin, the medical examiner, requesting that the applicant appear before Dr. Kane for a further medical examination, and that evening he called at the home of Mr. and Mrs. Weaver "and informed Mr. Weaver that he was to call at the doctor's office for further medical examination according to instructions from the company to me, and was assured that he would call in a couple of days"; and that about a week later he again called at their home, but did not find Mr. Weaver there, but repeated the instructions from the company to plaintiff, and informed her that no further action would be taken on the application until the applicant had called at the doctor's office; and that later, about November 18, he again called on Mrs. Weaver and again repeated that no action was being taken on the application

by the company, or would be taken, until he had made his appearance at the doctor's office for further medical examination. He testified that plaintiff assured him on each occasion that Mr. Weaver would report at the doctor's office.

The application was rejected by the company on December 26, 1930. Goodman was advised of this action, and on the date of the receipt of the letter Mrs. Weaver came into his office "and the substance of her conversation was that she had someone who was going to loan them the money to pay the premium on the application, and that she would be in and see me relative thereto. I tendered the note to Mrs. Weaver, but she would not accept it."

Dr. Kane testified that Weaver never again appeared at his office after the original examination.

The trial resulted in a verdict and judgment in favor of the plaintiff for approximately $3,000. Defendant moved for a new trial, which was denied. The appeal is from the judgment.

Defendant assigns eighty-nine specifications of error. Certain of them challenge the sufficiency of the complaint to state a cause of action.

It is a well-settled rule, established by the great weight of authority, that mere delay in passing upon an application for insurance cannot be construed as an acceptance thereof by the insurer so as to support an action *ex contractu*. (Note, 15 A. L. R. 1026.) In a class of comparatively recent cases, a right of recovery in an action of tort against insurers has been upheld on the ground of neglect in failing to act on an application where there was a subsequent loss not covered by insurance. The right to maintain such an action has been recognized in the following cases: *Duffie* v. *Bankers' Life Assn.*, 160 Iowa, 19, 139 N. W. 1087, 1089, 46 L. R. A. (n. s.) 25; *Behnke* v. *Standard Accident Co.*, (C. C. A.) 41 Fed. (2d) 696, 700; *Strand* v. *Bankers' Life Ins. Co.*, 115 Neb. 357, 213 N. W. 349; *Kukuska* v. *Ins. Co.*, 204 Wis. 166, 235 N. W. 403; *American Life Ins. Co.* v. *Nabors,* (Tex. Civ. App.) 48 S. W.

(2d) 459; *Columbian Nat. Life Ins. Co.* v. *Lemmons,* 96 Okl. 228, 222 Pac. 255; *Security Ins. Co.* v. *Cameron,* 85 Okl. 171, 205 Pac. 151, 27 A. L. R. 444; *De Ford* v. *New York Life Ins. Co.,* 75 Colo. 146, 224 Pac. 1049; *Dyer* v. *Missouri State Life Ins. Co.,* 132 Wash. 378, 232 Pac. 346; *Fox* v. *Volunteer State Life Ins. Co.,* 185 N. C. 121, 116 S. E. 266; *Carter* v. *Life Ins. Co.,* 11 Hawaii, 69; *Boyer* v. *State Farmers' Mut. H. Ins. Co.,* 86 Kan. 442, 121 Pac. 329, Ann. Cas. 1915A, 671, 40 L. R. A. (n. s.) 164; *Brown* v. *Missouri State Life Ins. Co.,* 124 Okl. 155, 254 Pac. 7; *Wallace* v. *Hartford Fire Ins. Co.,* 31 Idaho, 481, 174 Pac. 1009.

Courts from other jurisdictions condemn the rule announced in the above-cited cases and deny all recovery on the theory of an action in tort in this class of cases. (See *American Life Ins. Co.* v. *Nabors,* (Tex. Com. App.) 76 S. W. (2d) 497; *Schliep* v. *Commercial Casualty Co.,* 191 Minn. 479, 254 N. W. 618; *Munger* v. *Equitable Life Assur. Society,* (D. C.) 2 Fed. Supp. 914; *Metropolitan Life Ins. Co.* v. *Brady,* 95 Ind. App. 564, 174 N. E. 99; *Swentusky* v. *Prudential Ins. Co.,* 116 Conn. 526, 165 Atl. 686; *Savage* v. *Prudential Ins. Co.,* 154 Miss. 89, 121 So. 487; *Thornton* v. *National Council,* 110 W. Va. 412, 158 S. E. 507; *Interstate Business Men's Assn.* v. *Nichols,* 143 Ark. 369, 220 S. W. 477; *National Union Fire Insur. Co.* v. *School District,* 122 Ark. 179, 182 S. W. 547.) Instructive articles analyzing these two lines of authorities are found in 17 Minnesota Law Review, 578, Yale Law Journal, 121, and 75 Pennsylvania Law Review, 207. A statute providing that an application for hail insurance becomes binding unless notice is given of the rejection of the application within a specified time is constitutional. (*Wanberg* v. *National Unon Fire Ins. Co.,* 46 N. D. 369, 179 N. W. 666; Id., 260 U. S. 71, 43 Sup. Ct. 32, 67 L. Ed. 136.)

We do not, however, find it necessary in the case at bar to determine which of the divergent lines of authority above referred to we should adopt in this jurisdiction, as we shall presently develop.

At the close of the evidence in this case, a motion for a directed verdict was made based upon many grounds, the last of which was to the effect that the plaintiff had failed to show that "she had been damaged in any sum by reason of any failure or breach of duty on the part of the defendant company proximately causing the same."

Assuming, for the purposes of this opinion, but not deciding, ██ that we have adopted the rule for which plaintiff contends, the cases from the jurisdictions in which this rule has been adopted all hold that it is incumbent upon the plaintiff in a case such as the one at bar to establish damage by showing either that other insurance could have been secured or that the applicant was an insurable risk of such a character that other insurance companies would be likely to have accepted the risk. The case of *Duffie* v. *Bankers' Life Assur. Assn.*, supra, although not the first case announcing the rule for which plaintiff contends, is made the basis of nearly all the later cases adhering to the rule. The Iowa court in that opinion said: "Contingencies might have arisen, as suggested by counsel for appellee, which would have led to a different conclusion, as, upon inquiry, it might have been ascertained that applicant was so venturesome or reckless in his conduct as to render him an undesirable risk. It is enough to say that the record contains no intimation that such was the fact, and it ought not to be inferred that other than the truth would have been elicited by any inquiries which the insurer might have prosecuted. If the applicant was of such disposition or temperament that the association would not, if it had acted, have accepted the application and issued the certificate, then no injury can be said to have resulted from the delay. Whether or not in all reasonable probability the certificate would have been issued had the association acted on the application can only be determined from the record as presented to the court."

In the case of *Behnke* v. *Standard Accident Co.*, supra, it is written: "There is another outstanding fact which is fatal to appellants' right to damages for negligence. Before there can

be a recovery in such case damages must be proved. If appellants were unable to secure insurance from any other company it is difficult to understand how they were damaged on the theory of the complaint, by appellee's refusal, or its negligence in deciding. The only evidence on this point is that of Wolff, the insurance broker and general district manager of the Fidelity & Deposit Company of Maryland, who had been scouting for this policy since September 16. He says, 'We know of absolutely no company who will take on this risk.' This was uncontradicted, and the burden was upon appellants to discredit it if they could, otherwise there could be no damage and it was useless to send the case to the jury.''

In the case of *Wallace* v. *Metropolitan Life Ins. Co.*, 212 Wis. 346, 248 N. W. 435, 436, the court said: ''Further than this, there is no evidence tending to show that the assured could have obtained other insurance of the same kind and character. Whatever evidence there is in the case indicates that the applicant had a disease known as leakage of the heart. The evidence is not clear as to whether this was sufficiently serious to warrant rejection, but certainly there is no evidence that he was in sound health, and in view of his death within sixty days of the time of his application, it is impossible to conclude that plaintiff has made any showing that other insurance could have been obtained. It is evident that plaintiff has proved no damages.''

The supreme court of Iowa, in the case of *Winn* v. *John Hancock Mutual Life Ins. Co.*, 216 Iowa, 1249, 250 N. W. 459, 460, a case in which the court denied recovery, observed: ''Of course, it is also necessary, in order to recover for injury to or loss of any right, whether it be accrued or in the making, to show the extent, character, and value of the right. In this case it was clearly incumbent on the appellant to prove the contract of insurance, if not its exact terms and conditions, at least its substance, of which he claims his intestate was deprived. There is no evidence in the record as to the contract of insurance or as to the substance of the alleged contract of insur-

ance.  The failure to prove this essential of his case was fatal to the appellant, and the trial court upon the record submitted in this case had no other alternative than to direct a verdict, and the lower court was correct in so directing.''

The plaintiff testified that, if a notice of rejection had been received, application would have been made to other insurance companies.  No one assumed to express an opinion that under the facts and circumstances in this case a similar application would have been acceptable to other insurance companies.  The Metropolitan Life Insurance Company had the previous year declined to accept the risk.  The applicant had been advised the day before he made the application in question that he was suffering from tuberculosis.  If he made an application, he was duty bound to report that fact; and, if the application to defendant had been rejected, he would likewise have been required to record that fact in his application.

In the decided cases, supra, where the rule contended for by plaintiff has been announced and a recovery sustained, there was no question as to the desirability of the risk.  Clearly, unless other insurance could be secured in the event of the notice of a rejection, there would be no resulting damage as a result of the alleged negligence on the part of the defendant.

In the case of *Briggs* v. *Great Northern R. Co.*, 92 Mont. 463, 15 Pac. (2d) 840, 841, this court said: ''Surely, one who is not injured nor affected in any way or in any degree by the violation of a statutory duty cannot maintain an action for damages predicated upon its violation.''  And again it declared in *Mason* v. *Madson*, 90 Mont. 489, 4 Pac. (2d) 475, 478: ''For courts of equity do not, any more than courts of law, sit for the purpose of enforcing moral obligations or correcting unconscientious acts, which are followed by no loss or damage.''

Since the record contains no evidence of damage sustained by plaintiff, defendant's motion for a directed verdict should have been granted, and the trial court was in error in denying the motion.  The judgment is reversed and the cause remanded

to the district court of Silver Bow county, with directions to have a judgment of dismissal of the action entered.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.